EXHIBIT A

WILLIAM J. PULTE, an individual,

    Pulte,

vs.

BRANDON JONES, an individual,

    Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION

Defendant's Motion to Dismiss the First Amended Complaint for Lack of Personal Jurisdiction came before the Court for hearing on December 1, 2023. For the reasons set forth below, Defendant's Motion is DENIED.

### FINDINGS OF FACT

1.     Plaintiff, William J. Pulte ("Pulte") is a resident of Florida. Pulte Aff.[1] ¶¶ 79-80.

2.     Defendant, Brandon Jones ("Jones") is a resident of Georgia. Jones Aff. ¶ 1.

3.     Pulte asserts claims against Jones for defamation, tortious interference, intentional infliction of emotional distress, cyberstalking, and an injunction. Fl. Am. Compl. ("FAC").

### *Facts Establishing Waiver*

4.     "Personal jurisdiction is a personal right, and a respondent may consent to personal jurisdiction." *Miller v. Goodell,* 958 So. 2d 952, 953–54 (Fla. 4th DCA 2007) (citing *Babcock v. Whatmore,* 707 So. 2d 702, 704 (Fla. 1998)). Further, "[i]f a party takes some

---

[1] "Pulte Aff." refers to the filed version, which corrected issues Jones had with the original one submitted to this Court in paper copy, including deletion of paragraph 2.

step in the proceedings which amounts to a submission to the court's jurisdiction, then it is deemed that the party waived his right to challenge the court's jurisdiction regardless of the party's intent not to concede jurisdiction." *Bush v. Schiavo*, 871 So. 2d 1012, 1014 (Fla. 2d DCA 2004) (quoting *Cumberland Software, Inc. v. Great Am. Mortg. Corp.*, 507 So. 2d 794, 795 (Fla. 4th DCA 1987)).

5. If a party takes some step in the proceedings which amounts to a submission to the court's jurisdiction, then it is deemed that the party waived his right to challenge the court's jurisdiction regardless of the party's intent not to concede jurisdiction. *Sternberg v. Sternberg*, 190 So. 486 (Fla.1939). Defensive actions taken by a party do not constitute requests for affirmative relief inconsistent with the party's initial defense of lack of jurisdiction. *Kimbrough v. Rowe*, 479 So.2d 867 (Fla. 5th DCA 1985); *Orange Motors of Coral Gables, Inc. v. Rueben H. Donnelley Corp.*, 415 So.2d 892 (Fla. 3d DCA 1982); and *Public Gas Co. v. Weatherhead Co.*, 409 So.2d 1026 (Fla.1982). <u>However, a request for affirmative relief does waive the party's objection to personal jurisdiction.</u> *Kimbrough;* and *Hubbard v. Cazares*, 413 So.2d 1192 (Fla. 2d DCA 1981), *petition for rev. den.*, 417 So.2d 329 (Fla.1982). (emphasis added).

6. Jones filed suit against Pulte in the U.S. District Court for the Northern District of Georgia ("Georgia Action"), *Jones v. Pulte*, Case. No. 1:23-cv-01227-SEG. In the Georgia Action Jones seeks (among other things) "a permanent injunction and other appropriate equitable relief to restrain Pulte from republishing" certain statements. Ga. Am. Compl. ("GAC") at 83 (attached to Pulte Supp. Aff.).

7.      The operative complaint in the Georgia Action specifically refers to this lawsuit ("Florida Action"). *See, e.g.,* GAC ¶ 59, Ex. A to FAC at 1. The facts underlying the Georgia Action are intertwined and often overlap with the facts of the Florida Action.

8.      On September 1, 2023, Jones availed himself of this Court's jurisdiction to seek affirmative relief in the form of an injunction prohibiting Pulte from "publicly discussing this case *and the alleged facts underlying the lawsuit* on social media or through news outlets." Gag Mot. at 17 (emphasis added).

9.      On September 6, 2023, Jones again availed himself of this Court's jurisdiction to seek an emergency hearing on the Gag Motion or an *ex parte* order granting the Gag Motion.

10.     At the September 8, 2023 emergency hearing, Jones yet again availed himself of this Court's jurisdiction by seeking affirmative relief in the form of an injunction prohibiting "extra out-of-court statements concerning parties' views and opinions of the evidence of the case, parties' interpretations of the facts of the case, including any inferences that may be drawn, and the motives for the people that are either the witnesses or the actual defendant in this case, Brandon Jones, for defending his case." 9/8/23 Hearing Tr. at 11.

11.     The speech Jones sought to enjoin in the Florida Action via a gag order is the same speech he seeks to permanently enjoin and otherwise recover for in the Georgia Action. For example, nine (9) tweets for which Jones seeks a permanent injunction and other relief in the Georgia Action were cited in the Gag Motion as examples of the type of speech Jones wanted this Court to enjoin. *Compare* GAC ¶¶ 90, 97 *and* Ex. B. GAC at 173-179, 181-182 *with* Gag Mot. at 67, 69-72, 77, 84, 89-90.

12.     Similarly, three (3) articles for which Jones seeks a permanent injunction and other relief in the Georgia Action were cited in the Gag Motion as examples of the type of speech Jones

wanted this Court to enjoin. *Compare* GAC ¶¶ 83-84, 119 *with* Gag. Mot. at 104, 111-112, 119-120. Additionally, a website for which Jones seeks a permanent injunction and other relief in the Georgia Action were cited in the Gag Motion as types of speech Jones wanted this Court to enjoin. *Compare* GAC ¶¶ 88-92, 171 and Ex. B to GAC at 3-10 *with* Gag Mot. at 9-10.

13.     Jones obtained some relief from his Gag Motion. Specifically, this Court entered an Order prohibiting Pulte from "knowingly sending texts, issuing tweets, and publishing posts online or on social media that could be intimidating to witnesses, and intended to cause a witness to testify in one manner or another." 10/12/23 Order (citing Section 914.22, Florida Statutes).

14.     During the hearing on Gag Motion, Jones identified Ryan Marshall, CEO of PulteGroup, as a potential witness who might be intimidated by the speech Jones sought to enjoin. *See e.g.* 9/8/23 Hearing Tr. at 27-28. Ryan Marshall is identified in the operative complaints for both the Georgia and Florida Actions. *Compare* GAC ¶ 85 *and* Ex. B. to GAC at 3 *with* FAC ¶¶ 17-21, 23-27, 31, 42, 67, 152, 162-163, 169-171, 173-178, 181.

15.     To the extent Ryan Marshall is a potential witness in the Florida Action, he is also a potential witness in the Georgia Action.

16.     Jones offered no evidence either at the hearing or in connection with the Motion to Dismiss that he could not have sought the same injunctive relief in the Georgia Action and, in fact, he did not seek any such relief.

***Evidence and Allegations as to Personal Jurisdiction***

17.     Jones has been on Twitter for at least 15 years. Ex. 24 at 64.

18.     Using three fake accounts, Jones made numerous tweets directed to @pulte. Pulte Aff. ¶¶ 9-12, 18, 20.

19.     Pulte is the user of the Twitter account @pulte. *Id.* ¶ 17.

20.     Jones did not have to direct his tweets @pulte. Rather than replying to conversations involving @pulte or adding a tag to connect his tweets to @pulte, Jones could have simply posted his messages on his Twitter page without specifically tagging or replying to @pulte. Pulte Supp. Aff. ¶ 5. Jones admits he could have put his accounts in protected mode so only his followers could see his tweets and Pulte could not see. Ex. 25 at 29, 72.

21.     Jones posted at least one tweet @pulte while Jones was physically located in Florida to attend a PulteGroup board meeting and visit PulteGroup's manufacturing facility in Jacksonville, Florida. Pulte Aff. ¶¶ 2-6; Ex. 5 at DRM0000624; 12/1/23 Hearing Tr. at 30.

22.     <u>At least eight Florida residents accessed the tweets at issue in the FAC while in Florida.</u> Exs. 26-33.[2] (emphasis added).

23.     Jones sent at least one direct message to Pulte via Twitter. Ex. 37.

24.     Between November 2021 and November 2022, Jones contacted Pulte via Twitter 156 times total, including 11 times in one day and 46 times in one month. Pulte Aff. ¶¶ 38-40.

25.     In or around August 2022, Jones changed one account from @GoDetroitWin to @EverythingTaket <u>and set the account's location as Florida.</u> Ex. 24 at 69; FAC ¶ 135; Ex. 9. (emphasis added).

---

[2] The declarations submitted under 28 U.S.C. § 1746 may be considered in lieu of affidavits when analyzing personal jurisdiction. *Defense Control USA, Inc. v. 19 Atlantis Consultants Ltd. Corp.*, 4 So. 3d 694, 698-99 (Fla. DCA 3d 2009).

26. Three months later, Jones created the @GhostOfBillPulte account, which impersonated Pulte's grandfather, a well-known Florida resident, by using his obituary photo (among other things). Pulte Aff. ¶¶ 15, 16, 135-139.

27. <u>By setting the location for @EverythingTaket to Florida, Jones made it more likely the tweets will be seen by Florida users because Twitter users can request that search results prioritize tweets made "near me."</u> Supp. Pulte Aff. ¶¶ 2-3. (emphasis added)

28. The Court finds Jones' location selection to be clear evidence of intentional rather than random conduct given the numerous other choices he had, the implications of that choice, which Jones as a sophisticated user of Twitter should know, and the timing of the change in the overall Twitter campaign. Jones chose Florida.

29. Jones created the @GhostOfBillPulte account specifically to criticize Pulte, as indicating by the bio on that account which states: "My grandson torments poor people online by making them beg for money on Twitter." Pulte Aff. at ¶ 15.

30. Jones admits he did not have many followers. Ex. 25 at 72. Pulte has 3.1 million Twitter followers. *Id.* ¶ 22. Jones admits that all of Pulte's followers could see tweets made @pulte. Ex. 24 at 101; Ex. 25 at 29.

31. Jones admits that Pulte's followers likely include people in Florida, including followers in Palm Beach County. Ex. 24 at 101-102; Gag Mot. Indeed, almost 15,000 followers of Pulte are confirmed to be in Florida. Pulte Aff. ¶ 26.

32. Jones tweeted about Florida residents. *See, e.g., Id.* at ¶¶ 41-42. Between November 2021 and December 2022, Jones directed tweets to at least five Florida residents and followed at least 8 Florida residents besides Pulte. *Id.* ¶¶ 46-78.

33.    Pulte is the founder and Chief Executive Officer of Pulte Capital Partners, LLC ("Pulte Capital), which is based in Florida and invests and operates companies in the Florida housing industry. *Id.* ¶¶ 82-84. Pulte also runs the Bill Pulte Foundation, a Florida non-profit corporation located in Florida, with his wife and other members of the Pulte Family. *Id.* ¶¶ 95-97.

34.    Pulte has made numerous posts on his Twitter account indicating that he lives and works in Florida. *Id.* ¶¶ 85-93, 98-100. Jones admits that he regularly saw tweets posted by Pulte, including tweets about companies Pulte invested in through Pulte Capital. Ex. 24 at 97; Ex. 25 at 8. Jones necessarily saw one of Pulte's tweets containing a statement that was clearly issued from "Boca Raton, Florida" because Jones replied to it. Pulte Aff. ¶¶ 86-87

35.    Pulte's wife, kids, father, and aunt also live in Florida. *Id.* ¶¶ 42-43, 81, 113-114.

36.    Pulte's father builds homes in Florida through a Florida company located in Florida. *Id.* ¶¶ 106-108. Jones knew Pulte's father did business in Florida and even congratulated Pulte's father for the success he had selling homes in Florida. Ex. 16 at 17-22.

37.    Members of the Pulte Family, including Pulte's aunt, run the Pulte Family Charitable Foundation, Inc., a non-profit located and incorporated in Florida. Ex. 40; Pulte Aff. ¶¶ 112-116. The Pulte Family Charitable Foundation has close ties with PulteGroup. Pulte Aff. ¶¶ 117-118. Jones was familiar with the Pulte Family Charitable Foundation and even made several posts about its contractual relationships and control. *Id.* ¶¶ 119-120.

38.    Pulte alleges he suffered economic loss, reputational harm, and emotional distress in Florida. *Id.* ¶¶ 121-122.

39.    The only connection between Jones and Pulte prior to Jones embarking on his Twitter campaign against Pulte was their respective roles with PulteGroup. *Id.* ¶ 136.

40.     Jones was employed by and had an ownership stake in PulteGroup during all times relevant to the First Amended Complaint. Ex. 43 at 17; Ex. 24 at 144-45.

41.     Pulte served on the Board of Directors for PulteGroup from September 2016 through May 2020, and is currently one of the largest individual shareholders of PulteGroup. Pulte Aff. at ¶¶ 126-127.

42.     Jones admits his motivation for making the posts was that he felt Pulte was "attacking the company. He didn't work for the company, and I was asking why he felt compelled to attack people within the company or former employees of the company." Ex. 25 at 21. Jones admits a purpose in making posts was to defend himself because he "had worked for the company for a long time and had been responsible to some degree for the results of the company, and to attack employees or those of us that had worked created an emotional reaction." *Id.* at 21-22.

43.     Jones acknowledges that in "most cases," his posts were "an emotional reaction to something [Pulte] was saying critical of" Jones or other current or former employees of PulteGroup. *Id.* at 21-22.

44.     Both during and after Pulte's tenure on PulteGroup's Board of Directors, Pulte opposed the promotion of Jones. Pulte Aff. at ¶ 134.

45.     Jones' Twitter campaign against Pulte was in retaliation for Pulte's opposition to proposed promotions of Jones. *Id.* at ¶ 135.

46.     The @GhostOfBillPulte account impersonated the founder of PulteGroup, William J. Pulte III. *Id.* ¶¶ 124-125. The @EverythingTaket account impersonated a PulteGroup employee who lived and worked for PulteGroup in Florida. *Id.* ¶ 137. (emphasis added)

47. Jones was Senior Vice President of PulteGroup from October 2021 to December 2022. Ex. 24 at 147-48. While in that capacity, Jones communicated with numerous other PulteGroup employees, including PulteGroup's CEO, about Pulte. Ex. 16 at 1-16.

48. As Senior Vice President of Field Operations, Jones oversaw all of PulteGroup's homebuilding operations, including many in the State of Florida. *Id.* at 38-39, 148.

49. The area president for all of PulteGroup's Florida Operations directly reported to Jones. *Id.* at 40, 124-125. Each division president located in Florida reported directly to the Florida area president. *Id.* at 39-40. Jones communicated with Florida's five division presidents at least once a week. *Id.* at 40-42.

50. Eight more direct reports of Jones did work in Florida. *Id.* at 151-56, 167.

51. Jones reported Florida-specific matters to both the Chief Operating Officer and Chief Executive Officer of PulteGroup. *Id.* at 173-75.

52. In the ten (10) months between November 2021 and December 2022, Jones made or received 93 calls with Florida residents, including PulteGroup employees. Ex. 25 at 36-39.

53. Between November 2021 and December 2022, Jones made 6 separate trips to the State of Florida on behalf of PulteGroup. Ex. 24 at 54-55.

54. Jones spent a total of 9 days in Florida between November 2021 and November 2022 on behalf of PulteGroup. Pulte Aff. ¶ 167.

## CONCLUSIONS OF LAW

### *Jones Waived the Defense of Personal Jurisdiction*

1. "[I]f a party takes some step in the proceedings which amounts to a submission to the court's jurisdiction, then it is deemed that the party waived his right to challenge the court's

jurisdiction regardless of the party's intent not to concede jurisdiction." *Strober v. Harris*, 332 So. 3d 1079, 1083 (Fla. 2d DCA 2022) (quotation omitted).

2.      It is a well-established principle of Florida law that "a defendant waives a challenge to personal jurisdiction by seeking affirmative relief—such requests are logically inconsistent with an initial defense of lack of jurisdiction." *Babcock v. Whatmore*, 707 So. 2d 702, 704 (Fla. 1998). The fact that a timely objection to personal jurisdiction is made does not prevent a subsequent waiver. *Babcock*, 707 So. 2d at 704.

3.      A request for an injunction is a request for affirmative relief. *See Pensacola Beach Elementary Sch. v. Moyer*, 286 So. 3d 945, 946 (Fla. 1st DCA 2019) (finding that injunction was "affirmative relief" that neither party sought). Indeed, lawsuits seeking solely an injunction are regularly filed.

4.      In *Strober*, the court found a defendant waived personal jurisdiction by *merely agreeing* to the adjudication of another person's request for injunction. 332 So. 3d at 1083. Here, Jones did far more than just agree to the adjudication of an injunction – he *affirmatively requested* an injunction.

5.      Georgia courts are empowered to grant injunctions. *See* Ga. Code § 9-11-65.

6.      Because the statements at issue in the Gag Motion are the same type of – and in several instances the exact same – statements at issue in the Georgia Action, the U.S. District Court for the Northern District of Georgia could have granted Jones the relief sought in the Gag Motion. The district court is empowered to enjoin conduct that could be intimidating to witnesses and/or intended to cause a witness to testify in one manner or another. *See* 18 U.S.C. § 1512; Ga. Code § 16-10-93. An Order from the district court prohibiting certain tweets by Pulte would have equally applied to the grounds for the Gag Motion in this case.

7.     Jones could have asked the district court to enjoin conduct at issue in the Gag Motion in this case. By affirmatively seeking injunctive relief from this Court that could have been obtained in the Georgia Action, Jones waived the defense of lack of personal jurisdiction.

8.     Jones' characterization of the relief sought as "defensive" is without merit. The broad relief Jones sought was not necessary to defend the Florida Action, and the broad relief Jones sought went far beyond the limited relief this Court ultimately granted.

9.     The Court finds that Jones waived his personal jurisdiction challenge. Even if not waived, however, the Court finds Jones' jurisdictional challenge fails.

### *This Court Has Specific Jurisdiction Over Jones*

**Motion to Dismiss for Lack of Personal Jurisdiction**

The procedure for a motion to dismiss for lack of personal jurisdiction is as follows:

> A defendant wishing to contest the allegations of the complaint concerning jurisdiction or to raise a contention of minimum contacts must file affidavits in support of his position. The burden is then placed upon the plaintiff to prove by affidavit the basis upon which jurisdiction may be obtained. . . . In most cases, the affidavits can be harmonized, and the court will be in a position to make a decision based upon facts which are essentially undisputed.

*Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502–03 (Fla. 1989). If the affidavits cannot be harmonized, then the court must "hold a limited evidentiary hearing in order to determine the jurisdiction issue." *Id.* at 503. The defendant's affidavit need not be made on personal knowledge, *Extendicare, Inc. v. Estate of McGillen*, 957 So. 2d 58, 63–64 (Fla. 5th DCA 2007), whereas a plaintiff's response must be based on competent "proof," rather than speculation on matters outside of his direct knowledge. *Elmex Corp. v. Atl. Fed. Sav. & Loan Ass'n of Ft. Lauderdale*, 325 So. 2d 58, 62 (Fla. 4th DCA 1976); *Enzyme Envtl. Sols., Inc. v. Elias*, 60 So. 3d 1158, 1162–63 (Fla. 4th DCA 2011). The parties here agreed not to hold an evidentiary hearing. *Venetian Salami*'s two-prong test requires the trial court to determine (1) if jurisdiction exists under Florida's long-

arm statute, and (2) "if the defendant had sufficient minimum contacts with the State of Florida to satisfy due process." *JG Contracting Co. v. Tower Innovations Distrib., LLC*, 333 So. 3d 1139, 1141 (Fla. 4th DCA 2022) (internal quotation marks omitted).

## A. General Jurisdiction

**Only as a Result of His Waiver Does This Court Does Have General Jurisdiction Over Jones.**

This Court lacks general jurisdiction over Jones under the U.S. Constitution. The Fourth DCA has recognized that "[i]n recent years . . . the Supreme Court has heightened the constitutional due process standard for exercising general jurisdiction over a foreign corporation." *Imperial Cap., LLC v. Tradewinds, Ltd.*, 279 So. 3d 166, 168 (Fla. 4th DCA 2019) (citing *Daimler AG v. Bauman*, 571 U.S. 117 (2014)); *accord Banco de los Trabajadores v. Cortez Moreno*, 237 So. 2d 1127, 1134 (Fla. 3d DCA 2018) ("The constitutional due process standard . . . for determining general jurisdiction changed significantly with the United States Supreme Court's decisions in *Daimler*. . . and *Goodyear*."). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Daimler*, 571 U.S. at 137. The U.S. Constitutional standard for general jurisdiction is higher than the standard under Florida's longarm statute, which does not require that the defendant can be deemed to be at home or domiciled in Florida. *See* Fla. Stat. § 48.193; *see also Woodruff-Sawyer & Co. v. Ghilotti*, 255 So. 3d 423, 429 (Fla. 3d DCA 2018) ("[T]he due process standard for the exercise of general jurisdiction is even more exacting [than Florida's requirements for general jurisdiction]."). A court looks to the relative strength of a defendant's connections to the forum; thus, *e.g.*, the Fourth DCA held that a company having 12.9% of its sales in Florida was too *de minimis* to warrant general jurisdiction. *See Caiazzo v. Am.*

*Royal Arts Corp.*, 73 So. 3d 245, 259-261 (Fla. 4th DCA 2011) (discussing *Trs. Of Columbia Univ. v. Ocean World, S.A.*, 12 So.3d 788 (Fla. 4th DCA 2009)).

Were it not for the Jones efforts to seek affirmative relief (which relief was readily available in Georgia), this Court would not have general jurisdiction over Jones because the Court finds that Jones is not subject to general jurisdiction in Florida, where he is not "at home." He is domiciled in Georgia. His personal connections to Florida are *de minimis*. Plaintiff's arguments for general jurisdiction would have been unavailing.

### B. Specific Jurisdiction

There are three prongs to the specific jurisdiction due process test: (1) whether the plaintiff's claims "arise out of or relate to" Defendant's Florida contacts, (2) whether the defendant "purposefully availed" himself of the privilege of conducting activities in Florida, and (3) whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013).

### *The Long-Arm Statute Is Satisfied*

10.     A non-resident is subject to specific jurisdiction in Florida for claims arising out of "[c]omitting a tortious act within this state." Section 48.193(1)(a)(2), Florida Statutes. "[T]he defendant does not have to physically be present in Florida for a tortious act to occur in Florida. … [A] nonresident commits a tortious act within the State of Florida when he commits an act outside of the state that causes an injury within Florida. A defendant can commit a tortious act within Florida by telephonic, electronic, or written communications, even though the defendant never set foot in Florida." *Simple Signman Systems, Inc. v. Hershkop*, 2015 WL 12830470, at *4 (M.D. Fla. July 10, 2015).

11.     "[A]llegedly defamatory material about a Florida resident placed on the Web and accessible in Florida constitutes an 'electronic communication into Florida' when the material is accessed (or 'published') in Florida. ... When the posting is then accessed by a third party in Florida, the material has been 'published' in Florida and the poster has ... thereby committ[ed] the tortious act of defamation within Florida." *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1214-15 (Fla. 2010).

12.     The connexity requirement for personal jurisdiction is met when there is "a causal connection between the defendant's activities in Florida and the plaintiff's cause of action." *Kapila v. RJPT, Ltd.*, 357 So. 3d 241, 249 (Fla. 2d DCA 2023). Jones posted an allegedly defamatory tweet while physically present in Florida, which is also part of the course of conduct Pulte alleges. Jones also posted allegedly defamatory tweets while outside of Florida that were accessed in Florida by Florida residents, and which are part of Jones' conduct and/or intentional infliction of emotional distress allegations. The Court finds that there is ample evidence that the tweets were targeted to Florida and were received and reviewed by Florida residents. As such, the connexity requirement is met.

13.     The statements that Jones contends are not defamatory or not false are all arguably defamatory and false because, among other reasons, they are statements by Jones which are falsely represented to be statements made by others, *e.g..,* Stephen Matthews, Catalina Chen, Raymond Hutchinson. By falsifying the identities of the persons making the allegedly defamatory statements, Jones allegedly magnified his tweets regarding Pulte as coming from multiple people. All of the statements that were accessed by Florida residents in Florida constitute statements that arguably support Pulte's claim that Jones committed torts in Florida.

### *Due Process Is Satisfied*

14.     "Due process is satisfied if a defendant has purposefully directed his activities toward residents of the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Baronowsky v. Maiorano*, 326 So. 3d 85, 89 (Fla. 4th DCA 2021).  "In cases of intentional torts, there are two applicable tests that courts may employ to determine whether a defendant has purposefully availed himself of the privileges of conducting activities in the forum state: the *Calder* [*v. Jones*, 465 U.S. 783 (1984)] 'effects test' or the traditional minimum contacts test." *Hershkop*, 2015 WL 12830470, at *5; *Baronowsky*, 326 So. 3d at 89-91 (discussing *Calder*).

15.     Under the *Calder* effects test, due process is satisfied if the defendant (1) commits an intentional tort, (2) "aimed at the forum state" and "caused harm that the defendant should have anticipated would be suffered there." *Baronowsky*, 326 So. 3d at 89.  That test is satisfied where "a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Id.* at 91.

16.     *Calder* involved claims for libel and IIED (among others) against the president/editor and a reporter for the *Enquirer* based on an article the *Enquirer* published. 465 U.S. at 784-85. With the exception of some trips and phone calls to the forum state, most of their work occurred in their place of domicile. *Id.* at 785-86. But the Enquirer had a weekly circulation of 600,000 copies in California and 5 million copies nationally. *Id.* at 785.  Defendants argued that, as a reporter and editor, they had no economic stake in the sales of the article and were not responsible for the circulation of the article in California. *Id.* at 789. They likened their activity to that of welders who worked on a boiler in Florida that subsequently explodes in California, arguing that even if jurisdiction is proper over the manufacture, it is not over the welders who had no

control over and derived no economic benefit from their employer's sales in a distant state. *Id.*

The Supreme Court, however, rejected that argument, drawing a distinction between the welders, who were charged with "untargeted negligence," and the defendants whose "intentional, and allegedly tortious, actions were expressly aimed at California." *Id.* The Court explained:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. … [T]he brunt of the harm, in terms of both respondent's emotional distress and the injury to her professional reputation, was suffered in California.
>
> … Petitioner South wrote and petitioner Calder edited an article that they knew would have potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the *National Enquirer* had its largest circulation. Under the circumstances, petitioners must reasonably anticipate being haled into court there to answer for the truth of the statements made in their article. *An individual injured in California need not go to Florida to seek redress from persons who, though remaining in California, knowingly cause the injury in California.* … In this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis.

*Id.* at 788-90 (emphasis added).

17. Similar to *Calder*, Jones' alleged wrongdoing was intentionally directed against Pulte, a Florida resident. The brunt of the harm in terms of Pulte's emotional distress and injury to his reputation was allegedly suffered in Florida. It is alleged that Jones knew his posts would be distributed by Twitter in Florida, that Pulte had followers in Florida, and reasonably knew or should have known Pulte lived in Florida, and evidence was offered in support of these allegations. Although Jones did not control the distribution of Twitter posts and the posts can be accessed by anyone in the world on the worldwide web, Jones' acts in posting tweets @pulte, setting the location on the @EverythingTakeIt account to Florida, and utilizing Pulte's grandfather's obituary photo to post tweets is evidence that he "targeted" Florida more than any act by Calder in targeting California.

16

18.	In *Baronowsky*, the 4th DCA found that due process was satisfied even though defendant never set foot in Florida. In *Baronowsky*, the defendant bought a domain name that utilized the plaintiff's name and began using that site to publish a series of webpages containing allegedly defamatory statements. 326 So. 3d at 87 (buying domain name www.drcarlomaiorano.com). The court held, "Just as in *Calder*, Baronowsky's intentional conduct expressly aimed at residents of this state and causing reputational harm in this state connected him to the state and constituted sufficient minimum contacts to support the exercise of personal jurisdiction consistent with due process." *Id.* at 90. Jones' acts "were neither random nor fortuitous. To the contrary, they show that by [Jones'] own choice' over a period of years, [Jones] deliberately reached out beyond [his] home." *Kapila*, 357 So. 3d at 252. Here, by choosing to tweet @pulte rather than post on Jones' own Twitter page, Jones "reached beyond his home" to enhance the likelihood that his posts were seen by Pulte's 3.1 million followers around the country, 15,000 of whom are in Florida, rather than only his small number of followers.

19.	Here, as in *Baronowsky* and *Calder*, there is substantial evidence that Jones' Twitter activity was aimed not just at Pulte, but at Florida. Jones directed 155 tweets and a direct message over a one-year period at Pulte in Florida. FOF ¶¶ 21-22. The @GhostOfBillPulte account used the obituary photo of a dead Florida resident, Pulte's beloved grandfather, to direct taunts, harrassment, and defamatory statements at Pulte in Florida. FOF ¶ 24, 27. Jones targeted not only Pulte, but a wider Florida audience by impersonating a Florida resident with the @GhostOfBillPulte account and by assuming the identity of a Florida resident formerly employed by PulteGroup by setting Florida as the location for the @EverythingTaket account. FOF ¶¶ 23-24. These intentional acts increased the odds that Twitter users in Florida would see Jones' posts. FOF ¶ 25. Each post was made @pulte, which made the posts more likley to be seen by Pulte's

3.1 million followers, nearly 15,000 of whom are in Florida, as well as Florida Twitter users generally. FOF ¶¶ 28-29. Indeed, Jones' tweets were seen by at least eight (8) Florida residents in Florida. FOF ¶ 30. Jones posted about, directed tweets at, and followed numerous Florida residents besides Pulte. FOF ¶ 30.

20.     Jones "should have anticipated" that Pulte would be harmed in Florida. *See Baronowsky*, 326 So. 3d at 89. Jones followed Pulte on Twitter, where Pulte regularly indicated that he resides in and does business in Florida. FOF ¶ 33. Jones likely saw at least one such post because he responded to it. *Id.* Prominent members of the Pulte Family, including Pulte, his grandfather, father, and aunt have lived in Florida for years. FOF ¶¶ 34-35. Pulte is the founder and CEO of Pulte Capital, a company that has its principal place of business in Florida and invests in and operates companies in the Florida housing industry. FOF ¶ 32. Jones knew of Pulte's father, Mark Pulte's, Florida business and even congratulated him on the success of that business. FOF ¶36. The foundations run by the Pulte Family, including the Pulte Family Charitable Foundation (which has had close ties with PulteGroup for decades and with which Jones was very familiar) and the Bill Pulte Foundation, are all located in Florida. FOF ¶¶ 32, 37.

21.     Each of Pulte's claims in which he alleges harm suffered in Florida where he resides and does business are based on Jones' Twitter activity. As such, those claims clearly arise out of and relate to the contacts set forth above.

22.     Based on Jones' Twitter activity, the Court finds the *Calder* effects test met. Jones' intentional conduct was aimed at Florida and Jones should have anticipated that Pulte would be harmed in Florida. In examining the relationship among Jones, Florida, and the litigation, the various contacts Jones created with Florida, and not just Pulte, in making his alleged tweets are sufficient to satisfy due process. *See Baronowsky*, 326 So. 3d at 89. Like the defendant in

*Baronowsky*, Jones purposefully directed his allegedly defamatory statements, and statements allegedly intended to inflect emotional distress, to Florida residents by tweeting @pulte (rather than just posting his statements on his own Twitter page) and by creating two accounts using the false identies of Florida residents when he knew or "should have anticipated" Pulte would suffer injury in Florida. Indeed, the IIED claim is the equivalent of Jones intentionally throwing a rock to cause injury to Pulte in Florida." Jurisdiction over him is, therefore, proper. *Calder*, 465 U.S. at 790 (jurisdiction is proper where defendant "intentionally directed" wrongful conduct at resident of the forum state).

23. Jones relies heavily on *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 582 U.S. 255 (2017) and *Walden v. Fiore*, 571 U.S.277 (2014). Those cases, however, do not apply.

24. In *Bristol-Myers*, 592 non-California residents sued Bristol-Myers in California based on injuries allegedly caused by Plavix. *Id.* at 258-59. The non-resident plaintiffs did not allege they obtained Plavix in California, nor that they were injured by Plavix in California. *Id.* at 259. The Court held that there was no connection between the non-resident plaintiffs' claims and the forum state because "[t]he relevant plaintiffs are not California residents and do not claim to have suffered harm in that State." *Id.* at 265. It was not enough that *other* plaintiffs were prescribed, obtained, and ingested Plavix in California, and sustained their injuries in California. *Id.* at 264. In contrast, Pulte alleges that he suffered emotional distress and reputational harm in Florida because of Jones' intentional conduct directed specifically at Pulte in Florida. Pulte is not a non-resident basing allegations of personal jurisdiction on Jones' relationship with a third party.

25. *Walden* involved a *Bivens* action brought by two Nevada residents in Nevada against a Georgia police officer arising out of an alleged wrongful seizure of plaintiffs' cash at the Atlanta airport. 571 U.S. at 279-80. The officer "approached, questioned, and searched

respondents, and seized the cash at issue, in the Atlanta airport. … [P]etitioner later helped draft a 'false probable cause affidavit' in Georgia and forwarded that affidavit to a United States Attorney's Office in Georgia to support a potential action for forfeiture of the seized funds. Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at 288-89. On that basis, the Court held the police officer lacked the "minimal contacts" necessary to support jurisdiction in Nevada. *Id.* at 288. The Court distinguished *Calder* on the basis that, unlike the tort in *Walden*, "the defendants' intentional tort [in *Calder*] actually occurred in California" and "the injury to plaintiffs' reputation in the estimation of the California public connected the defendants' conduct to California." *Id.* at 288

26. In *Strober*, the allegedly defamatory statements were spawned by an interview that didn't occur in Florida, and the allegedly defamatory statements were posted on the defendant's personal You Tube channel, a website generally accessible to anyone. *Strober*, 332 So. 3d at 1082, 1085-86. Here, Jones made repeated visits to Florida and posted an allegedly defamatory statement while physically in Florida. Further, Jones manipulated his Twitter accounts to falsify Tweets directed @pulte by self-identified Florida residents. Jones did more than simply post his statements on his personal website where anyone could access them, like the defendant in *Strober*. Moreover, Florida residents received and reviewed in Florida many of the tweets.

27. Additionally, the Court finds the traditional minimum contacts test satisfied. In addition to the contacts Jones had with Florida through his Twitter activity, Jones had numerous additional contacts with Florida through his business dealings with PulteGroup. For example, as Senior Vice President of Operations, Jones oversaw PulteGroup's homesbuilding operations in Florida. FOF ¶ 49. The area president and the five division presidents located in Florida reported

to Jones, who then reported up to the COO and CEO on Florida homebuilding operations. FOF ¶¶ 50, 52. By virtue of this role, Jones made numerous and regular trips, calls, and emails to Florida.

28.     In determining whether the claims arise out of and relate to Jones business dealings with PulteGroup, this Court finds *Stone* instructive. There, the plaintiffs asserted various claims, including defamation and tortious interference, against defendants based on various defamatory statements, including an online article. 641 F. Supp. 3d at 1351-52. Those statements stemmed from frustrations defendants had with plaintiff concerning their business dealings. *Id.* at 1352. The contents of those statments accused plaintiff of wrongdoing in those business dealings. *Id.* The court found plaintiffs' claims were "related to and caused by Defendants' business contacts with Florida" because the defamatory statements themselves concerned the parties' business dealings. *Id.* at 1365.

29.     The same is true here. Jones' tweets accuse Pulte of wrongdoing while serving on the PulteGroup board and wrongfully taking credit for PulteGroup's success. And Jones' Twitter campaign was motivated by his frustration with Pulte (1) blocking Jones' promotions while Pulte was on the board of PulteGroup and (2) taking credit for PulteGroup success.

30.     This case involves a greater relationship between the claims and Jones' business dealings than those at issue in *Stone*. One of Jones' accounts impersonated PulteGroup's founder and another impersonated a PulteGroup employee. FOF ¶ 47. Additionally, Jones communicated with other PulteGroup employees, including PulteGroup's CEO about Pulte and even assisted PulteGroup in drafting a message to its employees (including those in Florida) about Pulte. FOF ¶¶ 48, 50, 52. Because there is more connection here between Jones' business dealings and Pulte's claims, the court finds that the claims sufficiently arise out of and relate to Jones' business dealings.

31.     In *Baronowsky v. Maiorano*, 326 So. 3d 85 (Fla 4th DCA 2021), similar to this case, the defendant did not challenge the application of *Internet Solutions.*   Instead, he argues that the complaint does not sufficiently allege that his statements were defamatory because it does not sufficiently allege that they were actionable. *See Internet Sols.,* 39 So. 3d at 1214 (quoting *Silver v. Levinson,* 648 So. 2d 240, 241–42 (Fla. 4th DCA 1994)) (recognizing that the court must determine whether the complaint states a cause of action for a specific tort in order to determine whether it can exercise jurisdiction over the defendant based on the commission of that tort within the state). Among other things, the complaint alleged that Baronowsky's statements about Dr. Maiorano's arrests were defamatory because they falsely implied that he was guilty or in danger of being convicted, when in fact the state had dropped the charges months before Baronowsky published his first webpage. The 4th DCA held that the court did not err in ruling that these unrefuted allegations were sufficient to support the exercise of jurisdiction under section 48.193(1)(a)(2). The allegations were sufficient to create issues of fact as to whether Baronowsky's statements were defamatory even if some of them were technically true. *See Jews for Jesus, Inc. v. Rapp,* 997 So. 2d 1098, 1106–08 (Fla. 2008) (recognizing a cause of action for "defamation by implication" where "literally true statements are conveyed in such a way as to create a false impression"); *LRX, Inc. v. Horizon Assocs. Joint Venture,* 842 So. 2d 881, 886–87 (Fla. 4th DCA 2003) (reversing an order directing a verdict for the defendant on a claim for libel because, even if the defendant's statements about the plaintiff were true, there were issues of fact as to whether the defendant implied knowledge of additional defamatory facts and as to whether the defendant had an improper motive in publishing the statements); *Lipsig v. Ramlawi,* 760 So. 2d 170, 183 (Fla. 3d DCA 2000) (recognizing that "truth is only a defense to defamation when the truth has been coupled with good motive" and that both truth and good

22

motives are issues for the jury). Baronowsky did not show that no reasonable person could find that his statements were defamatory or that the court otherwise erred in finding the allegations sufficient to establish jurisdiction under the long-arm statute.

The facts of this case have some similarity to the facts of *Calder* and *Baronowsky.* Baronowsky purposefully directed his statements to individuals who were patients of Dr. Maiorano, and who would have been Florida residents, by using Dr. Maiorano's name as his website's domain name, identifying Dr. Maiorano as an anesthesiologist in Hallandale and Fort Lauderdale, and asking the reader if Dr. Maiorano was their doctor. Baronowsky knew that the "reputation-based effects" of his statements would be felt by Dr. Maiorano in Florida. *See Walden,* 571 U.S. at 287, 134 S.Ct. 1115. And the reputational injury to Dr. Maiorano would not have occurred but for the fact that Baronowsky targeted his statements to Florida residents and Florida residents read those statements. *See id.* at 287–88, 134 S.Ct. 1115. Just as in *Calder* and *Baronowsky,* plaintiff's intentional conduct expressly aimed at residents of this state and were allegedly intended to cause reputational harm in this state and connect him to the state and, in this Court's view, constitute sufficient minimum contacts to support the exercise of personal jurisdiction consistent with due process. *See also Internet Sols.,* 39 So. 3d at 1216 n.11 (explaining that the due process analysis in an internet defamation case could include consideration of whether the defendant's allegedly defamatory website post "targeted" a Florida resident and was "purposefully directed" at Florida).

Another case often cited is *Shrader v. Biddinger,* 633 F.3d 1235, 1241 (10th Cir. 2011), which followed the *Calder* line of reasoning, applying it to the internet. While the court did state that "posting allegedly defamatory comments or information on an internet site does not, without more, subject the poster to personal jurisdiction wherever the posting could be read (and the

subject of the posting may reside)," it continued by following the analysis in *Calder*. *Id.* "Consistent with the thrust of the Calder-derived analysis for specific jurisdiction in the internet context discussed above, in considering what 'more' could create personal jurisdiction for such activities, <u>courts look to indications that a defendant deliberately directed its message at an</u> <u>audience in the forum state and intended harm to the plaintiff occurring primarily or particularly</u> <u>in the forum state.</u>" *Id.* (emphasis supplied).

31.     The final Due Process consideration is whether exercising personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Kapila*, 357 So. 3d at 25. Jones bears the burden to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *VAS Aero Servs., LLC v. Arroyo*, 868 F. Supp. 2d 1374, 1381 (S.D. Fla. 2012).

32.     Jones has failed to carry his burden. His affidavit states that Florida is an inconvenient forum for him because it "may" require him and his Georgia-based counsel to travel to Florida, which requires time and expense. Jones Aff. ¶ 116. "[G]eneralized inconvenience of litigating in a foreign forum is typically not sufficient to establish that the exercise of jurisdiction is constitutionally unreasonable." *Van Vechten v. Elenson*, 920 F. Supp. 2d 1284, 1294 (S.D. Fla. 2013). Nothing required Jones to retain Georgia-based counsel in addition to his two Florida-based attorneys. Since litigation always requires time and expense, litigating in the next state – one to which Jones regularly travels for work and pleasure – is not a burden. *See, e.g., id.*). Even if Jones were burdened, it would not outweigh the other factors. "Florida has a strong interest in affording its residents the ability to obtain relief from a non-resident's intentional misconduct that causes injury in Florida." *Arroyo*, 868 F. Supp. 2d at 1381. Pulte, as a Florida resident, has "an interest in obtaining convenient and effective relief in Florida." *Gubarev v. Buzzfeed, Inc.*, 253 F. Supp. 3d

1149, 1161-62 (S.D. Fla. 2017). This Court's exercise of jurisdiction is the "most efficient resolution" because this Court is familiar with the facts of this case, which has been pending in this Court over a year, and merits discovery continued alongside jurisdictional discovery for many months.

## CONCLUSION

As set forth above, Defendant's Motion to Dismiss the First Amended Complaint for lack of personal jurisdiction is **DENIED** and the stay on merits-based discovery is lifted.

DONE AND ORDERED at West Palm Beach, Palm Beach County, Florida, this 10th day of January, 2024.

G. JOSEPH CURLEY
Circuit Court Judge

Copies furnished via judicial e-service to all counsel of record.